James C. Shah
SHEPHERD FINKELMAN MILLER
 & SHAH, LLP
475 White Horse Pike
Collingswood, NJ 08107
Telephone: (856) 526-1100
Facsimile: (866) 300-7367
Email: jshah@sfmslaw.com

*Attorney for Plaintiff, the Class, and the Plan*

[Additional Counsel Listed On Signature Page]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| McCAFFREE FINANCIAL CORP., individually, on behalf of all similarly situated plan sponsors or other fiduciaries, and on behalf of the ADP TOTALSOURCE RETIREMENT SAVINGS PLAN, | Case No: |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| | JURY TRIAL DEMANDED |
| ADP, INC.; ADP TOTALSOURCE GROUP, INC.; the ADMINISTRATIVE COMMITTEE OF THE ADP TOTALSOURCE RETIREMENT SAVINGS PLAN; 401K ADVISORS, INC. n/k/a NFP RETIREMENT, and DOES No. 1-10, Whose Names Are Currently Unknown, | |
| Defendants. | |

**I.     INTRODUCTION**

1.     Plaintiff, McCaffree Financial Corp. ("Plaintiff" or "McCaffree"), individually as

a participating employer co-sponsor and a fiduciary of the ADP TotalSource Retirement Savings

Plan ("Plan"), brings this action under 29 U.S.C. § 1132, on behalf of the Plan and a class of

similarly-situated participating employer co-sponsors or other fiduciaries, against Defendants,

ADP, Inc. ("ADP"), ADP TotalSource Group, Inc. ("TotalSource"), the Administrative Committee of the ADP TotalSource Retirement Savings Plan ("Administrative Committee"), and Does No. 1-10, who are members of the Administrative Committee and whose names are currently unknown (collectively,  "ADP Defendants"), and 401K Advisors, Inc. n/k/a NFP Retirement ("NFP Retirement") (together with ADP Defendants, "Defendants"), the Plan's investment advisor, for breach of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. and related breaches of applicable law beginning six years from the date this action is filed to today (the "Class Period").

2. Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (i.e., 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment underperformance.

3. The Plan is a "multiple employer" 401(k) plan, as set forth in Section 413 of the Internal Revenue Code, sponsored by TotalSource.  McCaffree and other similarly-situated employers co-sponsor the Plan so that their eligible employees can participate in the Plan.

4. As of December 31, 2018, the Plan had 114,254 participants with account balances and assets totaling over $4.44 billion, placing it in the top 0.1% of all 401(k) plans by plan size.[1]  Defined contribution plans with substantial assets, like the Plan, have significant

---

[1]The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016 (pub. June 2019).

bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of 401(k) plans and the investment of 401(k) assets.  The marketplace for 401(k) retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.      The ADP Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  The ADP Defendants are fiduciaries under ERISA, and, as such, are obligated to act for the exclusive benefit of participants, ensure that the investment options offered through the Plan are prudent and diverse, and ensure that Plan expenses are fair and reasonable.

6.      As the Plan's investment advisor during the Class Period, NFP Retirement also had the obligation to act for the exclusive benefit of participants with respect to the Plan's investment options, and ensure that the investment options offered through the Plan are prudent and diverse.

7.      Defendants have breached their fiduciary duties to the Plan.  As detailed below, the ADP Defendants have: (1) allowed unreasonable recordkeeping/administrative expenses to be charged to the Plan; (2) failed to adequately monitor the Plan's recordkeeper and its affiliates, who the ADP Defendants have permitted to design an investment menu unreasonably favorable to them despite the recordkeeper's clear conflicts of interest;  and (3) along with NFP Retirement, selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, when more prudent alternative investments were available at the time that they were chosen for inclusion within the Plan and throughout the relevant period.

8.     To remedy these fiduciary breaches and other violations of ERISA, Plaintiff, individually and on behalf of the Plan and a class of similarly-situated participating employer co-sponsors or other fiduciaries, brings this action under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate and just under all of the circumstances.

9.     Specifically, Plaintiff seeks the following relief:

    a.     A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

    b.     A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

    c.     Equitable, legal or remedial relief for all losses and/or compensatory damages;

    d.     Attorneys' fees, costs and other recoverable expenses of litigation; and

    e.     Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.     THE PARTIES

10.     Plaintiff, McCaffree, is a Kansas corporation headquartered in Overland Park, Kansas, and co-sponsors the Plan for its employees.  As a co-sponsor, McCaffree is a fiduciary of the Plan.

11.     Defendant, ADP, is a public Delaware corporation headquartered in Roseland, New Jersey.  ADP provides human resources management software and other services to employers.

12.     Defendant, TotalSource, is a wholly-owned subsidiary and "reportable segment" of ADP headquartered in Miami, Florida.[2]  ADP runs its Professional Employer Organization business through TotalSource, providing "clients with comprehensive employment administration outsourcing solutions in which employees who work for a client ...  are co-employed by [TotalSource] and the client."[3]  TotalSource is the Plan's lead sponsor, maintains the Plan, and is responsible for selecting, retaining, and monitoring the Plan's service providers and the services they provide.  As such, TotalSource is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.

13.     ADP and TotalSource act as an integrated enterprise, alter egos of each other, and/or as a single/joint employer.  ADP controls and directs the activities of TotalSource from this judicial district.  Accordingly, as TotalSource is a fiduciary to the Plan, ADP is also a fiduciary to the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

14.     Defendant, Administrative Committee, is the Plan Administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee maintains its address at TotalSource's headquarters in Miami, Florida.  The Administrative

---

[2]The "objective of segment reporting 'is to provide information about the different types of business activities in which a public entity engages.'"  *A Roadmap to Segment Reporting*, Deloitte (pub. 2019), *available at* https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/Roadmaps/us-aers-a-roadmap-to-segment-reporting.pdf.
[3]ADP Annual Report for the fiscal year ended June 30, 2019, *available at* https://www.sec.gov/Archives/edgar/data/8670/000000867019000021/q4fy1910k.htm#s53446DD071DE59C8B3BD889D39708766.

Committee and its members are appointed by ADP and TotalSource to administer the Plan on TotalSource's behalf.

15.     Defendant, NFP Retirement, is the Plan's investment advisor and a fiduciary under ERISA pursuant to 29 U.S.C. § 1002, which maintains its headquarters in Aliso Viejo, California.  The ADP Defendants engaged NFP Retirement in or before 2010, and NFP Retirement served as the Plan's investment advisor throughout the Class Period.

16.     Defendants, Does No. 1-10, are the members of the Administrative Committee and, by virtue of their membership, fiduciaries of the Plan.  Plaintiff is currently unable to determine the membership of the Administrative Committee despite reasonable and diligent efforts because it appears that the membership of the Administrative Committee is not publicly available.  In addition, upon information and belief, the Board of Directors of ADP and/or TotalSource (or a committee thereof) is responsible for the appointment and monitoring of the Administrative Committee and, by virtue of their membership and responsibilities, are fiduciaries of the Plan.  As such, these defendants are named Does 1-10 as placeholders. Plaintiff will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Administrative Committee and other responsible individuals as defendants as soon as their identities are discovered.

### III.     JURISDICTION AND VENUE

17.     McCaffree seeks relief on behalf of itself and similarly-situated employer co-sponsors or other fiduciaries, on behalf of the Plan, pursuant to ERISA's civil enforcement remedies under ERISA Sections 409 and 502, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

19.     Venue is proper in this District pursuant to ERISA Section 502(e), 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because ADP's principal place of business is in this district. Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     Background And Plan Structure

20.     The Plan is a participant-directed multiple employer 401(k) plan, in which participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays Plan expenses from Plan assets, and substantially all administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The available investment options for participants of the Plan include various mutual funds and a common collective trust.

21.     Mutual funds are publicly-traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

22.     Common trusts are, in essence, mutual funds without the SEC regulation. Common trusts fall under the regulatory purview of the Office of the Comptroller of the

Currency or individual state banking departments.  Common trusts were first organized under state law in 1927, and were blamed for the market crash in 1929.  As a result, common trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds.  Today, common trusts are used only for their trust clients and for employee benefit plans like the Plan.  The main advantage of opting for a common trust, rather than a mutual fund, is the negotiability of the fees, so larger retirement plans should be able to leverage their size for lower fees.

23.    According to the Plan's most recently-filed Form 5500,[4] as of December 31, 2018, the Plan currently offers the following investment options to its participants, in addition to a self-directed brokerage account:

Collective Trusts

| Provider | Trust Name |
| --- | --- |
| Voya Trust Company | Target Solution Income |
| Voya Trust Company | Target Solution 2020 |
| Voya Trust Company | Target Solution 2025 |
| Voya Trust Company | Target Solution 2030 |
| Voya Trust Company | Target Solution 2035 |
| Voya Trust Company | Target Solution 2040 |
| Voya Trust Company | Target Solution 2045 |
| Voya Trust Company | Target Solution 2050 |
| Voya Trust Company | Target Solution 2055 |

---

[4] The Form 5500 is the annual report that 401(k) plans are required to file pursuant to the reporting requirements of ERISA.

| | |
|---|---|
| Voya Trust Company | Target Solution 2060 |
| Global Trust Company | Stable Value Collective Fund |
| BlackRock Institutional Trust Company | U.S. Debt Index Fund |
| BlackRock Institutional Trust Company | Russell 3000 Fund |
| BlackRock Institutional Trust Company | MSCI-ACWI Ex-US Index Fund |

Mutual Funds

| Provider | Trust Name |
|---|---|
| Fidelity Investments | Total Bond Fund |
| Vanguard | Balanced Index Fund |
| John Hancock | Disciplined Mid Value Fund |
| T. Rowe Price | Mid Cap Fund |
| T. Rowe Price | New Horizons Fund |
| Federated Investors | Clover Small Cap Fund |
| American Funds | EuroPacific Growth R4 Fund |
| American Funds | Washington Mutual |
| Voya Investment Management | Large Cap Growth Fund |
| Blackrock | Money Market Fund |

24.     The Plan had previously offered the Voya Trust Company Large Cap Value Fund as an investment option, but it was replaced in 2018 by the American Funds Washington Mutual investment option.

25.     The Plan had also previously offered the Voya Trust Company Target Solution 2015 as an investment option, but it was replaced in 2015 by the Voya Trust Company Target

Solution 2060 (presumably to account for the fact that the 2015 target date fund had reached its maturity).

26.     Voya Institutional Plan Services, LLC ("Voya Financial"), which the ADP Defendants engaged, was the recordkeeper for the Plan throughout the Class Period.  As the recordkeeper, Voya Financial is responsible for maintaining records with respect to employees' accounts in the Plan, effecting participant Plan investment elections, and performing administrative functions such as processing loan and withdrawal requests.

27.     During the Class Period, Plan assets were held in a trust by the Plan Trustee, Voya National Trust Company.  All investments and asset allocations are performed through the trust.

28.     And as noted above, during the Class Period, the ADP Defendants also engaged NFP Retirement as the Plan's investment advisor.

**B.     Defendants' Breaches of Fiduciary Duties**

29.     There are many indications that Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan.  Plaintiff did not acquire actual knowledge regarding the breaches at issue until shortly before this Complaint was filed.

**1.     The Plan's Excessive Total Plan Cost**

30.     The first and obvious indicator of the ADP Defendants' breach of their fiduciary duties is the Plan's excessive recordkeeping and administrative costs.  Plaintiff has been unable to conduct a complete evaluation of the Total Plan Cost ("TPC")[5] of the Plan as the expense

---

[5]TPC refers to the sum of all fees and expenses associated with the operation of a retirement plan; notably, the recordkeeping fees, any other administrative fees, and investment management fees.  The TPC permits a straight "apples-to-apples" comparison of the total fees incurred by different plans, as service providers can and do manipulate price reporting by shifting or re-directing their fees to investment management expenses to minimize the billing for

ratios for five of the collective trust investment options are not publicly available. Nonetheless, even a partial calculation, which omits the Plan costs associated with those investment options, indicates that the Plan's TPC is outrageous and significantly above the market average for similarly-sized and situated 401(k) plans.

31.     The most recent Brightscope/ICI study published in June 2019 indicates that the average TPC for a plan with over $1 billion in assets was 0.28% of net assets as of 2016.[6] By contrast, the Plan's TPC, exclusive of the additional costs associated with those five collective trust investment options (which must be added to establish actual TPC and which would indisputably increase the total TPC of the plan), ranges between 0.65% to 0.78% of net assets:

| Year | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| TPC as % of Net Assets | 0.78% | 0.69% | 0.78% | 0.65% | 0.72% |

This difference resulted in a TPC that was over 300% higher than the ADP Defendants should have reasonably accepted or negotiated for under any circumstances and caused the Plan to incur annual overpayments of fees of at least $16.4 million to $22.2 million (without even taking into account expenses and payments related to the five undisclosed collective trust investment options). The ADP Defendants' failure to ensure that the Plan paid reasonable and appropriate expenses in terms of TPC was a profound and outrageous breach of fiduciary duty based upon any objective evaluation of the ADP Defendants' conduct.

32.     As the five investments with undisclosed expense ratios had between $600 thousand and $1.1 million of the Plan's assets during the relevant period, the investment

---

recordkeeping and other service components, and vice versa.
[6]Given technological advances and market-based competitive pressures since 2016, the average TPC should be even lower today.

management fees charged would drive the TPC calculated herein even higher.  It also bears noting that, for most of the mutual funds in the Plan lineup, the Form 5500s do not enumerate the share class.  To be conservative, the calculations above assume that the Plan is invested in the least expensive share class for each fund where it is not explicitly stated.  If the Plan is, in fact, invested in any of the more expensive share classes of its mutual fund options, the TPC will be even higher and even more objectively outrageous in nature.

### 2.     The Plan's Excessive Recordkeeping/Administrative Costs

33.     Independent of the Plan's TPC, the recordkeeping fees and administrative fees paid by the Plan are, in and of themselves, incredibly high.  According to one industry publication,[7] the average cost for recordkeeping **and** administration in 2017 for plans much smaller than the Plan (plans with 100 participants and $5 million in assets) was $35 per participant.[8] As of December 31, 2018, the Plan had $4.44 billion in plan assets and 114,254 participants.  Given its size, and resulting negotiating power, with prudent management and administration, the Plan would have unquestionably been able to obtain a per-participant cost significantly lower than $35 per participant.

34.     Despite the size and negotiating power of the Plan, the per-participant fees for recordkeeping costs **alone** were the following astounding amounts during the pertinent period:

| Year | Per-Participant Recordkeeping Fee |
|------|-----------------------------------|
| 2014 | $124.28 |

---

[7]The 401k Averages Book (20th ed.).

[8]Other courts have acknowledged that a plan with $3.4 billion in assets and 41,863 active participants should be paying $30 per participant (*Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1064 (M.D. Tenn. 2018)) and that the "market rate" of total administrative fees for "jumbo" plans, *i.e.*, those within the top 1%, should be $35 per participant (*Sacerdote v. New York Univ.*, No. 16-CV-6284 (KBF), 2017 WL 3701482, at *9 (S.D.N.Y. Aug. 25, 2017)).

| 2015 | $91.36 |
| 2016 | $117.25 |
| 2017 | $98.50 |
| 2018 | $79.76 |

35.     In addition to the recordkeeping fee, the Plan also paid several other administrative fees for the following services: Investment Advisor (participant level), Investment Advisor (plan level), Legal, Audit, Administrator, Consultant, Brokerage, and Participant Communication.  These fees added up to significant costs, and combined with the recordkeeping fee, the all-in administrative costs of the Plan are far above the industry average.  As a percentage of Plan assets, the administrative costs ranged from 0.29% to 0.42% from 2014-2018.  In each of those years, the administrative fee component for the Plan was much higher than the average TPC for plans with over $1 billion in assets from the most recent Brightscope/ICI defined contribution plan study.

36.     As noted above, the Brightscope/ICI study indicates that the average TPC for plans of that size (over $1 billion in assets) is 0.28% of net assets.  The bulk of any TPC is made up by the investment management fees.  Yet the ***administrative cost alone*** of the Plan, at a range of 0.29% to 0.42% of the Plan's assets from 2014-2018, was higher than the average amount of what the TPC of the Plan should have been – even after taking into account investment and other expenses not included in the administrative cost calculations.  Given the size of the Plan, this difference resulted in annual overpayments of fees of between $440,000 and $6.22 million, not including payments related to investment management.  Once the investment management

component of the Plan's fee is included, the Plan's TPC dwarfs the average TPC for a plan of its size, thereby confirming the shocking nature of the ADP Defendants' breaches at issue.

37.     As such, it is clear that the ADP Defendants either engaged in virtually no examination, comparison, or benchmarking of the TPC and/or recordkeeping/administrative fees of the Plan to those of other similarly-sized 401(k) plans, or were complicit in paying grossly excessive fees.  Had the ADP Defendants conducted any examination, comparison, or benchmarking, the ADP Defendants would have known that the Plan was paying grossly excessive fees.  Based upon the Plan's design, participants in the Plan pay virtually all of the excessive fees and, as a result, achieve considerably lower retirement savings, since those excessive fees, particularly when compounded, have a damaging impact upon the returns attained by participant retirement savings.

38.     By failing to recognize that the Plan and its participants were being charged much higher fees than they should have been and/or failing to take effective remedial actions, the ADP Defendants breached their fiduciary duties to the Plan.

**3.     The ADP Defendants' Lack Of Oversight Over And Undue Reliance On Voya[9] And Voya's Conflicts Of Interest**

39.     In connection with the exorbitant recordkeeping and administrative fees, the ADP Defendants also appear to have given Voya *carte blanche* in designing the Plan's investment menu so as to permit Voya to extract the most fees possible.

40.     As the Plan's recordkeeper, Voya Financial was the beneficiary of the ADP Defendants' imprudence and/or divided interests.  At the same time Voya was engaged as the Plan's recordkeeper, however, other Voya entities were extracting more fees in their capacities

---

[9]Unless otherwise noted, Voya Financial and its affiliated entities, including Voya Trust Company and Voya Investment Management, are referred to as "Voya" herein.

as investment managers to the Plan.  As described above, a significant portion of the Plan has been invested in Voya-managed investment options throughout the relevant period, including the line of target date collective trusts and other individual mutual funds.

41.    All of the Voya funds that the Plan offers as investment options are proprietary funds, despite the fact that the Plan could have, and should have, demanded non-proprietary funds to avoid any potential or realized conflicts of interest.  A proprietary fund, also known as a house-brand fund, is created when the brokerage firm that distributes the fund also serves as the fund's investment manager.  Thus, Voya both distributes the funds in which the Plan invests, and manages the Plan's investments in the Voya funds.

42.    Many of these Voya proprietary funds, especially the Voya target date collective trusts, are "funds of funds," whereby the proprietary funds created by Voya do not directly invest in securities.  Instead, a Voya investment manager selects underlying funds managed by a sub-advisor—which can be another Voya entity or a third party—through which it invests in securities.  The top Voya investment manager determines the fund's goals and investment strategies, and selects the sub-advisor to manage the fund's assets.  Because Voya's proprietary funds are "funds of funds," the Plan is required to pay multiple layers of the fees: (1) to Voya, as the fund manager; and (2) to the sub-advisor of the underlying fund, which may be another Voya entity.[10]

43.    As the "manager of managers" of the fund, Voya has the unilateral right to hire and fire sub-advisors and to vary the amount of assets allocated to a given sub-advisor.  To the

---

[10]For example, the suite of Voya Target Solution Collective Trusts discloses that the Voya Large Cap Growth Trust Fund and the Voya Small Cap Core Trust Fund are some of the funds through which it invests, meaning that Voya receives investment fees both upstream and downstream, and then at the recordkeeping/administrative level.

extent that Voya is able to select a sub-advisor with a low sub-advisory fee, Voya can adjust the revenue it derives from the fund and ultimately from the Plan.

44.     Indeed, Voya's affiliates are sub-advisors in its investment options.  This poses potential conflicts of interest because Voya will receive more revenue when it selects an affiliated fund rather than an unaffiliated fund.

45.     These conflicts of interest are further and significantly magnified by the ADP Defendants' retention of Voya entities (Voya Investment Advisors from 2014 to 2015, followed by Voya Retirement Advisors, LLC from 2016 onward) as investment advisors for the Plan's participants.  These Voya entities have a clear financial incentive to direct the participants to Voya proprietary investment options, as doing so would mean further revenue for Voya extracted through the gauntlet of Voya affiliates taking their share of investment management fees as discussed above.  In other words, the objectivity of these Voya entities from the moment they were retained by the ADP Defendants to advise participants was questionable and a breach of duty.

### 4.     The Plan's Objectively Imprudent Investment Options

46.     Many of the Plan's investment options are objectively imprudent, separate and apart from the apparent excesses with respect to the Plan's recordkeeping and administrative fees and relationship with Voya, which the Plan entered into at Defendants' behest.

47.     It is a basic principle of investment theory that the risks associated with an investment must first be justified by its potential returns for that investment to be rational.  This principle applies even before considering the purpose of the investment and the needs of the investor, such as the retirement assets here.  The Capital Asset Pricing Model ("CAPM"), which

is used for pricing securities and generating expected returns for assets given the risk of those assets and the cost of capital, provides a mathematical formula distilling this principle:

$ERi=Rf+\beta i(ERm-Rf)$, where:

$ERi$=expected return of investment
$Rf$=risk-free rate
$\beta i$=beta of the investment
$(ERm-Rf)$=market risk premium

Applied here and put simply, the $\beta i$ is the risk associated with an actively-managed mutual fund or collective trust, which can only be justified if the $ERi$ of the investment option is, at the very least, above that of its benchmark, $Rf$.[11]  Otherwise, the model collapses, and it would be imprudent to assume any risk without achieving associated return above the benchmark returns.

48.    Indeed, especially with large-cap mutual funds, market research has indicated that investors should be very skeptical of an actively-managed fund's ability to consistently outperform a passively-managed fund mimicking its benchmark.[12]

49.    Yet, 16 of the 28 investment options that Defendants selected for the Plan during the Class Period failed to meet that basic standard.  As illustrated below, these investment options could not consistently provide returns above their benchmarks, and even during the infrequent periods when they did exceed their benchmarks, the difference was not significant. As such, these investment options could not and cannot be justified by their risk or the fees paid to the funds' investment advisors, and were thus imprudently selected, retained, and/or monitored by Defendants.

---

[11]In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.
[12]For example, in 2015, the S&P Dow Jones Indices published its research showing that "just 23% of all large-cap core active funds outperformed the S&P 500 Index in the three-year period ended 2014." https://www.indexologyblog.com/2015/08/05/large-cap-funds-active-versus-passive/.

50.     Moreover, the Plan assets placed in these imprudent investment options constituted between 50.23% and 53.11% of total Plan assets during the Class Period, making their impact on diminishing Plan assets incredibly significant.

i.      The Voya Target Solution Collective Trusts

51.     Voya's target date collective trusts should not be offered as investment options in a plan of the Plan's size (and likely not in any retirement plan offered in the United States).  Not only are they barely utilized in other retirement plans, their performance is lacking when compared to popular, cheaper target date alternatives, like the Vanguard Target Retirement Funds.  The Investor share class of the Vanguard Target Retirement Funds suite, the most widely utilized target date offering, charges between 24 and 27 basis points (0.24% - 0.27%) less than the 39 basis point (0.39%) cost of the Voya Target Solution Collective Trusts, and, during the only data point publicly available,[13] substantially outperforms the Voya target date collective trusts on a trailing 5- and 10-year basis, virtually across the board.

**5-year Trailing Performance as of 12.31.19**

| Voya Target Solution Fund | Performance, Inclusive Of Expenses | Comparable Vanguard Target Retirement Fund Performance, adjusted for investment expense; (expense ratio) | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| Income | 4.93% | 4.80% (0.12%) | 0.13% |
| 2020 | 5.91% | 6.42% (0.13%) | -0.51% |
| 2025 | 6.75% | 6.99% (0.13%) | -0.24% |

---

[13]The only publicly available performance data for the Voya Target Solution Collective Trusts is a single Fact Sheet that provides 1-, 5-, and 10-year trailing returns as of December 31, 2019.

| 2030 | 7.31% | 7.41% (0.14%) | -0.10% |
| 2035 | 7.85% | 7.81% (0.14%) | 0.04% |
| 2040 | 8.11% | 8.20% (0.14%) | -0.09% |
| 2045 | 8.30% | 8.41% (0.15%) | -0.11% |
| 2050 | 8.36% | 8.41% (0.15%) | -0.05% |
| 2055 | 8.38% | 8.38% (0.15%) | 0.00% |



**10-year Trailing Performance as of 12.31.19**

| Voya Target Solution Fund | Performance, adjusted for investment expense | Comparable Vanguard Target Retirement Fund Performance, adjusted for investment expense; (expense ratio) | Investment Option Performance/Underperformance Compared to Benchmark |
| --- | --- | --- | --- |
| Income | 5.90% | 5.82% (0.12%) | 0.08% |

| 2020 | 7.33% | 8.03% (0.13%) | -0.70% |
| 2025 | 8.16% | 8.59% (0.13%) | -0.43% |
| 2030 | 8.71% | 9.07% (0.14%) | -0.36% |
| 2035 | 9.22% | 9.54% (0.14%) | -0.32% |
| 2040 | 9.47% | 9.87% (0.14%) | -0.40% |
| 2045 | 9.83% | 9.98% (0.15%) | -0.15% |
| 2050 | 9.82% | 9.98% (0.15%) | -0.16% |



52.     Voya Target Solution Collective Trusts' lack of usage in the industry alone highlights the imprudence of selecting and retaining them as investment options for the Plan.  As of December 31, 2019, the Voya Target Solution Collective Trusts only had a total of $2.6 billion in assets under management.  Of that $2.6 billion, the Plan held $1.49 billion, or 57% of the total assets under management.

53.     At the same time, Voya's mutual fund target date offerings did not have substantially more assets.  By way of illustration, the Voya Target Retirement 2030 Fund currently has $28.1 million in assets under management, the Voya Solution 2030 Portfolio has $40.0 million, and the Voya Index Solution 2030 Portfolio has $592.66 million.  In contrast, the Vanguard Target Retirement 2030 mutual fund has more than $34 billion in assets under management.

54.     In other words, neither the Voya Target Solution Collective Trusts nor Voya's other mutual fund target date solutions are widely utilized by other retirement plans or the investing community at large.  Entrusting a significant portion of the Plan's assets to a small player in the market given the Plan's market power indicates that the selection and retention of the Voya Target Solution Collective Trusts was the result of an imprudent process of selecting and monitoring investment options for the Plan.

55.     Even more egregiously, Defendants' inability, despite the Plan's status as the Voya Target Solution Collective Trusts' majority investor, or perhaps unwillingness, to demand fees significantly lower than those charged by the collective trusts' mutual fund equivalents (the least expensive share class of the Voya Target Retirement mutual funds range bottom at 0.41%, on which the Collective Trusts offer only a 2 basis point discount), further indicates an imprudent process of selecting and monitoring investment options for the Plan.  This is especially true as the collective trust vehicle is intended, in large part, to permit custom pricing based on a client's negotiating power – this obviously did not occur in the instance of the Plan.

56.     Finally, that Voya is also the Plan's recordkeeper, and, as detailed above, is receiving exorbitant recordkeeping and administrative fees for its services, indicates that the

ADP Defendants had other motivations besides the interests of the Plan and its participants in selecting and retaining Voya's target date investment options.

57.     The importance of the selection or, in this instance, mis-selection, of target date funds for a 401(k) plan cannot be understated:

> Target retirement funds are designed to be the only investment vehicle that an investor uses to save for retirement.  Also referred to as life-cycle funds or age-based funds, the concept is simple: Pick a fund, put as much as you can into the fund, then forget about it until you reach retirement age.[14]

Given that the vast majority of plan participants in general, of which the Plan participants are no exception, are not sophisticated investors, they largely, by default, concentrate their retirement assets in target date funds, allowing a single investment election to provide them with a diversified, all-in-one solution.  As such, the impact of an imprudent selection of target date funds is magnified vis-à-vis other asset categories.  Indeed, as of December 31, 2018, just under $1.5 billion, or **34.4%** of Plan assets, were invested in the poor performing Voya Target Solution Collective Trusts, which never should have been selected, approved or retained as investments in the Plan.

ii.     The Voya Trust Company Large Cap Growth

58.     Voya Trust Company Large Cap Growth Fund has consistently and significantly underperformed its benchmark, the Russell 1000 Growth Index.  From 2016-2018, the Large Cap Growth Fund trailed its benchmark on a rolling 5-year basis.  While 2019 returns data for the Fund is unavailable, most recent quarter-end data from March 31, 2020 shows the Fund's 5-year trailing return falling short of its benchmark by a whopping 125 basis points (1.25%).  A longer-

---

[14] https://www.investopedia.com/articles/retirement/07/life_cycle.asp.

term view yields even more stark poor performance; the 10-year trailing returns for the Fund lag

those of its benchmark in every year from 2014 through 2018, and though 2019 returns are

unavailable, as of March 31, 2020, the Fund's 10-year return trailed its benchmark by 24 basis

points (0.24%).

### 10-year Trailing Performance

| As of | Performance (adjusted for investment expense) | Russell 1000 Growth Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|-------|----------------------------------------------|-------------------------------------|----------------------------------------------------------------------|
| 4Q2018 | 14.97% | 15.29% | -0.32% |
| 4Q2017 | 9.04% | 10.00% | -0.96% |
| 4Q2016 | 7.91% | 8.33% | -0.42% |
| 4Q2015 | 7.98% | 8.53% | -0.55% |
| 4Q2014 | 7.80% | 8.49% | -0.69% |



59.     When the investment option's track record is apparent as it is here, the Plan

should select or replace the investment option with one that has shown that it can consistently

outperform the benchmark, or, at the very least, retain an investment option that tracks the benchmark.  By way of example and to illustrate, there is a Vanguard Russell 1000 Growth Index Fund that tracks the Russell 1000 Growth Index benchmark, with a very low expense ratio of 0.07%.

   iii.   <u>The Voya Trust Company Large Cap Value Fund</u>

  60.  The Voya Trust Company Large Cap Value Fund was replaced in 2018, but had been consistently underperforming both its benchmark, the Russell 1000 Value Index, and its peer group (as defined by Morningstar) for many consecutive years and should have been jettisoned from the Plan's investment menu long before it was ultimately removed:

**<u>Annual Return v. Benchmark and Peer Group</u>**

| Year | Performance, adjusted for investment expense | Performance/Under performance Compared to Benchmark | Performance/Underperformance Compared to Morningstar Peer Group |
|------|------|------|------|
| 2017 | 13.63% | -0.03% | -2.32% |
| 2016 | 13.72% | -3.62% | -1.09% |
| 2015 | -4.41% | -0.58% | -0.37% |
| 2014 | 9.92% | -3.53% | -0.29% |
| 2013 | 30.58% | -1.95% | -0.64% |
| 2012 | 14.46% | -3.05% | -0.11% |





61.     Once again, it is objectively imprudent to select and retain an investment option that does not consistently outperform (or, at the very minimum, meet) its benchmark.  When the investment option's track record is apparent, as it is here, the Plan should select or replace the investment option with one that has shown that it can consistently outperform the benchmark, or, at the very least, retain an investment option that tracks the benchmark.  By way of example and

to illustrate, there is a Vanguard Russell 1000 Value Index Fund that tracks the Russell 1000

Value Index benchmark, with a very low expense ratio of 0.07%.

    iv.    <u>The American Funds Washington Mutual Fund</u>

62.    In 2018, Defendants finally replaced the Voya Trust Company Large Cap Value

Fund with the American Funds Washington Mutual investment option.  However, the

Washington Mutual Fund was never an appropriate replacement and should not have been added

to the Plan lineup.  At the time of its selection in 2018, it had demonstrated a consistent inability

to beat its benchmark, the S&P 500 Index, over a 5-year period, and continued to do so after its

selection by Defendants:



63.    The relatively new Washington Mutual Fund did not have a 10-year track record

until the end of 2019, at which point, unsurprisingly, it trailed its benchmark by 47 basis points

(0.47%).  This investment option was not an appropriate addition to the Plan menu at the time of

its selection, and it remains a woefully poor investment alternative.

64.     And, as noted above, it is well accepted that choosing an actively managed mutual fund in the large cap space makes little or no sense because more than three quarters of them usually fail to outperform the S&P 500 Index.

v.      The Federated Investors Clover Small Cap Value Fund

65.     The Federated Investors Clover Small Cap Value Fund has also consistently and significantly underperformed its benchmark, the Russell 2000 Value Index, on a rolling 5-year basis:

**5-year Trailing Performance**

| As of | Performance, adjusted for investment expense | Russell 2000 Value Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|-------|----------------------------------------------|------------------------------------|----------------------------------------------------------------------|
| 4Q2019 | 4.72% | 6.99% | -2.27% |
| 4Q2018 | 2.34% | 3.61% | -1.27% |
| 4Q2017 | 12.50% | 13.01% | -0.51% |
| 4Q2016 | 12.79% | 15.07% | -2.28% |
| 4Q2015 | 7.15% | 7.67% | -0.52% |



66.     The fund's returns have been so poor over the past several years that by the end of 2019, its trailing 10-year performance was a whopping 139 basis points (1.39%) below its benchmark.

67.     Once again, it is objectively imprudent to select and retain an investment option that does not consistently (or, at a minimum) outperform its benchmark.  When the investment option's track record is apparent as it is here, the Plan should select or replace the investment option with one that has shown that it can consistently outperform the benchmark, or, at the very least, retain an investment option that tracks the benchmark.  By way of example and to illustrate, there is a Vanguard Russell 2000 Value Index Fund that tracks the Russell 2000 Value Index benchmark, with a very low expense ratio of 0.08%.

                    vi.     The American Funds EuroPacific R4 Fund

68.     There are and were no apparent, outstanding issues with the performance of the American Funds EuroPacific Fund.  However, Defendants selected the R4 share class for the Plan to invest, which has an expense ratio of 0.84%, while significantly less expensive share

classes, such as the R-5E (0.62% expense ratio), the R-5 (0.53% expense ratio), and the R-6

(0.49% expense ratio) share classes, were available to the Plan.

69.     There is no distinction whatsoever, ***other than price***, between the share classes for

the same investment option.  The share class is typically, if not always, dependent on the

negotiating leverage of the investor; in other words, large institutional investors, especially those

in top 0.1% of 401(k) plans like the Plan, have substantial amounts of monies to invest, such that

investment managers will agree to lower fees/offer cheaper share classes for access to those Plan

assets.  As such, it was objectively imprudent of Defendants to have selected the more expensive

share class.

## V.     ERISA'S FIDUCIARY STANDARDS

70.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plan.  29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan
> solely in the interest of the participants and beneficiaries and -
>
> (A)     for the exclusive purpose of
>
>     (i)     providing benefits to participants and their
>             beneficiaries; and
>     (ii)    defraying reasonable expenses of administering the plan;
>
>                    [and]
>
> (B)     with the care, skill, prudence, and diligence under the
>         circumstances then prevailing that a prudent man acting in a like
>         capacity and familiar with such matters would use in the conduct
>         of an enterprise of like character and with like aims.

71.     Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets

of a plan shall never inure to the benefit of any employer and shall be held for the exclusive

purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

72.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

73.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.

74.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

75.     29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides, in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.    CLASS ALLEGATIONS

76.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually, on behalf of the Plan, to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

77.    In acting in a representative capacity and to enhance the due process protections of unnamed participants of the Plan, and as an alternative to other procedural protections that may be employed if the proposed class is not certified for any reason, Plaintiff seeks to certify this action as a class action on behalf of a class of similarly situated employer co-sponsor fiduciaries of the Plan.  Plaintiff seeks to certify, and to be appointed, as representative of, the following class (the "Class"):

> All current participating employer co-sponsors or other fiduciaries of the Plan, excluding Defendants and all other individuals who are or have ever been a member of the Administrative Committee of the ADP TotalSource Retirement Savings Plan.

78.    The action meets the requirements of Rule 23 and should be certified as a class action for the following reasons:

a.    The Class includes more than 5,000 members and is so large that joinder of all its members is impracticable;

b.    There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and all participants and beneficiaries, yet took the actions and omissions alleged herein as to the Plan and not as to any

individual participant or beneficiary or distinct group of participants or beneficiaries.  Thus, common questions of law and fact exist, including the following, without limitation: to whom are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether Defendants breached their fiduciary duties to the Plan during the Class Period; what are the losses to the Plan resulting from each breach of fiduciary duty during the Class Period; and what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches of duty during the Class Period;

c.  Plaintiff's claims are typical of the Class because Plaintiff is a employer co-sponsor of the Plan and thus also a fiduciary to the Plan; the Plan was harmed by Defendants' misconduct; and ERISA authorizes fiduciaries to bring suit on behalf of the Plan for legal and equitable remedies caused by breaches of fiduciary duty by other fiduciaries;

d.  Plaintiff is an adequate representative of the Class because it is a fiduciary to the Plan; has no interest that is in conflict with the Class; is committed to the vigorous representation of the Class; and has engaged experienced and competent attorneys to represent the Class; and

e.  Prosecution of separate actions for these breaches of fiduciary duties by other employers and co-sponsors of the Plan would create the risk of: (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a); and (B) adjudications by individual employers and co-sponsors

regarding these breaches of fiduciary duties and remedies would, as a practical

matter, be dispositive of the interests of employers and co-sponsors not parties

to the adjudication or would substantially impair or impede their ability to

protect the Plan.

79.     Plaintiff's counsel will fairly and adequately represent the interests of the Class

and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of

Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an

individual basis and there will be no difficulty in managing this case as a class action.

80.     Therefore, this action should be certified as a class action under Rules 23(a) and

23(b)(1) and/or 23(b)(1).

**COUNT I**
**(For Breach Of Fiduciary Duty)**

81.     Plaintiff incorporates by reference the allegations in the previous paragraphs of

this Complaint as if fully set forth herein.

82.     Defendants' conduct, as set forth above, violates their fiduciary duties under

ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants

failed and continue to fail to discharge their duties with respect to the Plan solely in the interest

of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing

benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of

administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with such matters would

use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act

in accordance with the documents and instruments governing the Plan.  In addition, as set forth

-33-

above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

83.     To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

84.     As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

85.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (In The Alternative, Liability For Participation In Breach Of Fiduciary Duty)

86.     Plaintiff incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

87.     In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a breach of trust.

88.     To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and the other expenses of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of and the Plan and a class of similarly-situated participating employer co-sponsors and fiduciaries, demands judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## **JURY DEMAND**

Plaintiff demands a jury trial with respect to all claims so triable.

## **NOTICE PURSUANT TO ERISA § 502(h)**

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h),

the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was

served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return

receipt requested.

DATED: May 4, 2020                           SHEPHERD, FINKELMAN, MILLER
                                               & SHAH, LLP

                                             /s/ James C. Shah
                                             James C. Shah
                                             475 White Horse Pike
                                             Collingswood, NJ 08107
                                             Telephone: (856) 526-1100
                                             Facsimile: (866) 300-7367
                                             Email: jmiller@sfmslaw.com

                                             James E. Miller
                                             Laurie Rubinow
                                             Shepherd Finkelman Miller & Shah, LLP
                                             65 Main Street
                                             Chester, CT 06412
                                             Telephone: (860) 526-1100
                                             Facsimile: (866) 300-7367
                                             Email: jmiller@sfmslaw.com
                                                      lrubinow@sfmslaw.com

                                             John F. Edgar
                                             EDGAR LAW FIRM LLC
                                             2600 Grand Blvd., Ste. 400
                                             Kansas City, MO  64108
                                             Telephone: (816) 531-0033
                                             Facsimile: (816) 531-3322
                                             Email: jfe@edgarlawfirm.com

Kolin C. Tang (SBN 279834)
SHEPHERD, FINKELMAN, MILLER
 & SHAH, LLP
1401 Dove Street, Suite 540
Newport Beach, CA 92660
Telephone: (323) 510-4060
Facsimile: (866) 300-7367
Email: ktang@sfmslaw.com

Bruce D. Parke
Alec J. Berin
SHEPHERD, FINKELMAN, MILLER
 & SHAH, LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: bparke@sfmslaw.com
        aberin@sfmslaw.com

**Attorneys for Plaintiff, the Plan**
**and the Proposed Class**